# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------X

MOHAMMED ALNAHER,

        **COMPLAINT**

        Plaintiff,

    v.

ANAHEIM HOTEL INVESTMENT LLC and
FIRSTPATHWAY PARTNERS LLC,

        Defendants.

---------------------------------------------------------X

    Plaintiff, Mohammed Alnaher, by and through his counsel, Certilman Balin Adler & Hyman, LLP, as and for a complaint against the Defendants, Anaheim Hotel Investment LLC and FirstPathway Partners LLC, respectfully alleges and shows to this Court upon information and belief as follows:

## INTRODUCTION

    1.    This is an action arising from Defendants' failure to return Plaintiff's investment and related sums in connection with a private offering of units in Anaheim Hotel Investment LLC (sometimes referred to as the "Company") as detailed in the Company's "Confidential Investment Letter," "Private Placement Memorandum," "Operating Agreement" and related documents, and from Defendants' misconduct in connection with the solicitation, receipt, use, and refusal to return Plaintiff's investment funds under the facts and circumstances related to his investment in the Company.

## JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

3.     Defendants consented and agreed to commence any action in the United States District Court for the Eastern District of Wisconsin, so long as the action falls within the subject matter jurisdiction of this Court, and otherwise in the District Court of Milwaukee County, Wisconsin.

4.     Defendants waived objections to jurisdiction and venue and consented to service by registered or certified mail.

5.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District, transact business here, and because the forum-selection clause designates this Court.

6.     Wisconsin law governs the agreements and claims at issue.

## PARTIES

7.     Plaintiff Mohammed Alnaher, an individual, and resident of the State of Nevada, is a subscriber and investor who transmitted funds for the purchase of "Units" in Anaheim Hotel Investment LLC pursuant to the Company's Confidential Investment Letter, Private Placement Memorandum, Exhibit Volume, Operating Agreement and related documents.

2

8. Plaintiff Mohammed Alnaher, as an investor ("Immigrant Investor") (as defined in the Company's Operating Agreement) intended to apply for approval of an I-526 Immigrant Petition by Alien Entrepreneur (the " I-526 Petition") through investment in the Company under the Immigrant Investor Program (as defined in the Company's Operating Agreement).

9. The critical element under the Immigrant Investor Program is job creation in the United States ("U.S.").

10. Defendant Anaheim Hotel Investment LLC (the "Company") is a Wisconsin limited liability company with its principal business address at 311 East Chicago Street, Suite 510, Milwaukee, WI 53202.

11. The Company offered for sale (the "Offering") units of Limited Liability Company Interest (the "Units"). The Units were sold in the U.S. and in jurisdictions outside the U.S. only to persons who are "Accredited Investors," as that term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Act").

12. The Units were sold to "Non-U.S. Persons," as that term is defined in Rule 902 of Regulation S under the Act, who reside in jurisdictions outside the U.S. at the time of the Offering that also, to the extent required, are deemed suitable by legally registered or licensed entities engaged by the Company to sell the Units in such foreign jurisdictions.

13. The Units offered by the Company have not been registered under the Act and are offered for sale in reliance upon an exemption provided by Section 4(2) of the

Act, Rule 506 of Regulation D and Regulation S promulgated thereunder, other applicable exemptions and the securities laws of the states or non-U.S. securities laws relating to transactions not involving a public offering.

14. Through its private placement, the Company sought capital commitments for its Units on a "best efforts" basis, at a purchase price of $500,000 per Unit. A minimum investment commitment per investor of $500,000 (one (1) Unit) was required, unless waived by the Company in its sole discretion. Through its Offering, the Company targeted the sale of an aggregate of $115,000,000 in Units. The Company represented that a maximum amount of 230 Units would be sold in establishing the "Fund."

15. Investors who purchase Units and meet the qualifications for admission as Members described in the Company's publications and in the Company's Limited Liability Company Operating Agreement (the "Operating Agreement") became Class X members (the "Members") in the Company.

16. As detailed in its Private Placement Memorandum ("PPM") dated April 2018, the Company was formed to extend financing through the Fund for the development, construction and operation of a 466-room hotel in Anaheim, California (the "Project") which is described in greater detail in Exhibit C in the Exhibit Volume of the Private Placement Memorandum. The Project is located within the geographic boundaries of the Southern California Regional Center dba California Golden Fund ("SCRC"). The Company represented that it intended that the Project would generate 10

4

or more direct or indirect full-time jobs for each $500,000 in financing made to the Project by the Company.

17. The Company also represented that generally, all financing extended by the Company will have a term of at least five years.

18. The Company reported that in the third year of operations, based on revenues, operations jobs totaled 638.7 jobs in the Fiscal Year 2023 (October 1, 2022–September 30, 2023). This was said to be in addition to the 1,880.2 construction phase jobs, totaling a cumulative 2,518.9 jobs created. The claim by the Company was that the Funds have sustained the investment in the Project and have collectively created more than the requisite 2,300 jobs, enough to support the petitions of all 230 Class X members in the Funds.

19. Defendant FirstPathway Partners LLC (FirstPathway) is the "Manager" of Anaheim Hotel Investment LLC and maintains its principal business address at 311 East Chicago Street, Suite 510, Milwaukee, WI 53202; its managers include Robert W. Kraft and Daniel Wycklendt.

20. The governing documents provide that all management and control of the Company will be exercised by its Manager, FirstPathway Partners LLC. The Manager is the sole Class A Member of the Company and pursuant to the agreements is entitled to all of the Company's distributions and proceeds over and above the annual, non-compounded one quarter of one percent (0.25%) preferred return of the Class X Members,

5

as described in the Operating Agreement. The Manager was not required to contribute any capital to the Company in exchange for the Manager's Class A membership interests in the Company.

21.     As Manager of the Funds, FirstPathway Partners is obligated to continue to work actively with the Project and its developer. The Manager has represented that its most important goal is the success of the investors in not only obtaining a Green Card but also ensuring preservation of investment.

22.     FirstPathway, as the agent and manager of Anaheim Hotel Investment LLC, is obligated to continue to closely monitor the Project on behalf of the Funds' investors and to carry out the purpose for which the Company was formed, including delivering upon and ensuring the accuracy of the representations by the Company and performance of obligations of the Company to the Members of the Company.

## FACTUAL ALLEGATIONS

**Immigrant Investor**

23.     The United States (U.S.) created the employment-based fifth preference (EB-5) immigrant visa category in 1990 to attract foreign investment capital into the United States. The objective of the EB-5 visa category is to channel private funds into U.S. businesses and development projects that promote economic growth.

24.     Immigrants who invest in and manage U.S. commercial enterprises that benefit the U.S. economy may obtain conditional permanent residence (2 years) and then

6

a "Green Card," authorizing lawful permanent residence in the U.S. after removal of conditions (the EB-5 Immigrant Investor Program).

25.     A "Green Card" is the informal name for lawful permanent resident (LPR) status in the United States. The physical card is officially called a Permanent Resident Card (Form I-551).

26.     Under U.S. immigration law, to be a Green Card holder means a person has been granted the legal right to live and work permanently in the United States.

27.     Each investment, among other things, needs to create or save at least 10 full-time jobs for U.S. workers, the core requirement of the program. For many years the basic amount required to invest was $1 million, although that amount is reduced to $500,000 if the investment is made in a high unemployment area or qualifying rural region.

28.     To stimulate interest in the EB-5 program, in 1992/1993 the U.S. enacted an EB-5 regional center pilot program. The five-year pilot program has been regularly reauthorized ever since.

29.     The program name was later amended to EB-5 regional center program, striking 'pilot' from the name. The regional center program allows public and private entities to apply to the U.S. immigration agency, which was then known as the Immigration and Naturalization Service (INS), now the United States Citizenship and Immigration Services (USCIS) for regional center status. According to the Defendants, The Southern California Regional Center ("SCRC") has been designated by the USCIS as

7

a qualified regional center.

30. On June 30, 2021, the EB-5 Regional Center Program expired. On March 15, 2022 it was renewed as part of the Consolidated Appropriations Act, 2022, which included authority for the EB-5 Immigrant Investor Regional Center Program and major changes to the program including more regulation and government oversight, security provisions to preclude participants from taking advantage of the program and a grandfather clause that protects participants from being put into abeyance should the program expire, as it did in 2021, during the term of the good faith investment (the EB-5 Reform and Integrity Act of 2022, or the "Act").

31. The Act made substantial changes to the Immigrant Investor Program such as setting the minimum investment amounts under the Program at $800,000 in targeted employment areas ("TEA"), $1,050,000 in non-TEAs and created new visa set-asides among the 10,000 EB-5 visas available annually.

32. Important compliance changes affecting regional centers include that (i) USCIS must audit them at least every five years; (ii) disclosure is required of third-party agent fees and their involvement in a project; (iii) persons who have committed certain crimes or have been subject to orders or sanctions by certain state or federal enforcement agencies may not be involved with regional center; (iv) direct and third-party promoters must register with the USCIS; (v) only citizens and permanent residents may be involved with a regional center and foreign governments are barred from any aspect of regional

8

center ownership.

33. The changes were necessary and welcomed by many since the EB-5 Immigrant Investor Program is a capital-for-green-card program designed to bring foreign investment into the U.S. economy and create American jobs, in exchange for lawful permanent residence.

**The Project**

34. The JW Marriott Anaheim (the "Project") consists of the development and construction of a 466 room, 11 story, 606,742 square foot hotel. The Project resides on a 2.8-acre site, including air rights above the adjacent Anaheim Gardenwalk retail area and features a full-service bar and restaurant, resort style pool, JW Gardens, rooftop bar, fully equipped fitness center with yoga and Zen room, business center, concierge services, child activity center, subterranean parking and over 40,000 square feet of indoor and outdoor meeting/banquet space.

35. Gardenwalk Hotel I, LLC ("Owner") is coordinating efforts with Prospera Hotels, Inc. and O'Connell Hotels & Hospitality Group, known collectively as Pacifica Hotels, LLC ("Developer") to develop, construct and operate the Hotel. GardenWalk Hotel Holdco I, LLC ("Borrower") is the sole owner of the Owner.

36. Gardenwalk Hotel I, LLC entered into a Management Agreement dated as of March 10, 2015 with Marriott International, Inc. ("Marriott International") to manage and brand the property.

9

37.     The Project is located in Anaheim's highly sought-after Anaheim Resort District, within walking distance of the Disneyland Parks, which annually attracts over 25 million visitors. It is also within walking distance of the Anaheim Convention Center, the largest convention center in the Western United States.

38.     The Project is located, and the Company will invest exclusively in the SCRC area. By investing in a regional center such as the SCRC, the Company represented that there are additional advantages for those desiring to apply for permanent residence through investment in the Company.

39.     The Project opened August 19, 2020, and was granted the final certificate of Occupancy on October 1, 2020.

**Project Finance**

40.     Financing for the Project closed on November 22, 2017. The total Project construction budget was $294 million. Anaheim Hotel Investment LLC and Anaheim Hotel Investment 1 LLC[1] (collectively the "Funds") utilized $115 million of immigrant investor funds to make loans of $81.5 million to AHI Mezz LLC ("Mezz")[2] and $33.5 million to AHI Pref LLC ("Pref")[3]. Mezz has loaned $81.5 million to the Borrower at 4.5%

---

[1] Upon information and belief, a Wisconsin issuer of exempt securities associated with defendant Anaheim Hotel Investment LLC and FirstPathway Partners LLC.
[2] Upon information and belief, a Wisconsin entity associated with defendant Anaheim Hotel Investment LLC and FirstPathway Partners LLC.
[3] Upon information and belief, a Wisconsin entity associated with defendant Anaheim Hotel Investment LLC and FirstPathway Partners LLC.

10

and Pref made a preferred equity investment in Borrower of $33.5 million at 4.5%. Marriott International[4] provided $8 million in key money to the Project at opening. Bank OZK[5] provided a senior loan of $141 million. The bank's loan is senior to the Funds' loan and preferred equity.

41. In May 2021, the Borrower modified its senior loan with Bank OZK. The modification resulted in an increase in the maximum principal amount of the loan from $141 million to $154 million. As of December 31, 2021, the Project had borrowed $147 million from Bank OZK. In addition, the maturity date of the senior loan was extended from May 22, 2021 to May 22, 2024, with a one-year extension option (May 22, 2025). In conjunction with the senior loan modification, Mezz amended the maturity date of its loan from November 22, 2022, with three, one-year extension options (November 22, 2025) to May 22, 2024 with a one-year extension option (May 22, 2025). With all extension options exercised, the senior loan, the EB-5 loan and EB-5 preferred equity matured on May 22, 2025.

**The EB-5 Application Process**

42. To apply for a permanent residence, an Immigrant Investor must provide complete biographical information. In addition, an Immigrant Investor must prove that the funds invested come from lawful sources, such as wages, profits from business

---

[4] Upon information and belief, a multinational hospitality company.
[5] Upon information and belief, a regional bank known for commercial real estate and construction lending.

11

operations or proceeds from the sale of real estate, stock or other investment. To prove the source of investment funds, an Immigrant Investor must provide documents such as foreign business registration records, corporate, partnership and personal income tax returns, or certified copies of any judgments or evidence of all pending governmental actions, etc.

43.     The Company's Private Placement Memorandum and related documents provided the steps for submission of documentation to earn permanent residence.

44.     Step 1. File Form I-526 (Immigrant Petition by Alien Entrepreneur) and supporting documents with the USCIS.

> Once a) USCIS issues an I-797 Notice of Receipt acknowledging the filing of Immigrant Investor's Form I-526 Petition, the Company will close on the Immigrant Investor's subscription agreement and the subscription payment of $500,000 per Unit will be released to the Company by the Manager. The Manager will utilize all or a portion of the Administrative Fee deposit of $50,000 to cover expenses incurred by the Manager in connection with the Investor's purchase of the Units. The Manager expects that its actual expenses incurred in connection with an Investor's purchase of Units will generally be approximately $50,000.

> If a Form I-526 petition is finally denied and if the Company has had a reasonable amount of time and opportunity to cure the issue, the Company will return to the Immigrant Investor an amount of $50,000 (equal to the Administrative Fee previously paid by the Immigrant Investor, without interest). An Investor would not, however, be entitled to require the Company to redeem his or her Unit(s) or otherwise to a return of any or all of his or her $500,000 capital contribution as a result of the Immigrant Investor's Petition being denied.

12

45.     Step 2. Upon approval of the I-526 petition, (a) if an Immigrant Investor is in the U.S., and is otherwise eligible, the investor may apply for Adjustment of Status to Permanent Residence by submitting Form I-485 and supporting documents to the USCIS; or (b) if an Immigrant Investor is outside the U.S., the Immigrant Investor must submit a visa application to the U.S. Department of State's National Visa Center and then wait for notification of an interview to be conducted by the appropriate U.S. Consulate in his or her home country (or the American Institute in Taiwan if the Investor resides in Taiwan).

46.     Step 3. Upon obtaining the approval of the I-485 application or through a successful visa application and admission, an Immigrant Investor will receive conditional permanent residence.

47.     Step 4. Within 90 days prior to the second anniversary of admission to conditional permanent residence status, an Immigrant Investor must file Form I-829 (Petition by Entrepreneur to Remove Conditions) to remove conditions on the conditional permanent residence. Once that petition is approved, an Immigrant Investor will have the conditions removed from the permanent residence. The investor then qualifies for U.S. Citizenship 5 years after acquiring the conditional permanent residence.

48.     According to the Company, if a Form I-829 petition is finally denied solely because of lack of job creation and if the Company has had a reasonable amount of time and opportunity to cure the lack of job creation issue, the Company will return to the Immigrant Investor an amount of $50,000 (equal to the Administrative Fee previously

13

paid by the Immigrant Investor, without interest). An Investor would not, however, be entitled to require the Company to redeem his or her Unit(s) or otherwise to a return of any or all of his or her $500,000 capital contribution as a result of the Investor's petition being rejected during this Step 4.

49.     The immigrant investors, such as Plaintiff intend in participating in the Offering by the Company, exercising the sole purpose of doing the same which is to apply for a U.S. permanent residence through investment in the Company.

50.     Defendants offered "Units of Limited Liability Company Interest" in Anaheim Hotel Investment LLC (the "Company") at a price of $500,000 per Unit; the Offering was for up to a maximum aggregate offering amount of $115,000,000 and 230 Units.

51.     Plaintiff, as an Immigrant Investor, was required to wire a $500,000 Total Capital Contribution per Unit plus a $50,000 Administrative Fee to an Escrow Account designated and controlled by the Manager.

52.     Under the Offering terms, the Escrow Agent was to hold the funds until USCIS issued an I-797 Notice of Receipt acknowledging filing of the investor's Form I-526 Petition, which would trigger the release of the subscription payment and Administrative Fee for the Company's use.

53.     The Manager retained discretion to terminate a subscription if the investor failed to file an I-526 Petition within 180 days from the date of deposit, and to instruct the

14

Escrow Agent to release the Total Capital Contribution and Administrative Fee back to the investor, without interest.

54. The Company obligated itself, upon a final denial of the I-526 after a reasonable opportunity to cure, to return the $50,000 Administrative Fee without interest; the Company disclaimed any obligation to redeem the Units or to return the investor's capital contribution based on a petition denial.

55. Defendants' Offering materials state there is no assurance that the Company will repay any or all of investors' capital and that investors have no right to require redemption of their Units on denial of petition although return of capital upon a successful completion and operation of the Project was implied.

56. In reliance on Defendants' Offering, and with the intention to apply for a U.S. permanent residence through investment in the Company, Plaintiff transmitted $500,000 per Unit subscribed plus a $50,000 Administrative Fee to the designated Escrow Account in January 2019.

57. The Escrow Agent, at the direction of the Manager upon USCIS I-797 receipt for Plaintiff's I-526 filing, released Plaintiff's subscription funds to the Company for the Company's use.

**The Delay**

58. The Project opened August 19, 2020, and was granted the final certificate of Occupancy on October 1, 2020.

15

59.     In May 2021, the Project modified its senior loan with Bank OZK. The modification resulted in an increase in the maximum principal amount of the loan from $141 million to $154 million. As of December 31, 2022, the Project had borrowed $147 million from Bank OZK. In addition, the maturity date of the senior loan was extended from May 22, 2021 to May 22, 2024, with a one-year extension option (May 22, 2025).

60.     In conjunction with the senior loan modification, Mezz amended the maturity date of its loan from November 22, 2022, with three, one-year extension options (November 22, 2025) to May 22, 2024 with a one-year extension option (May 22, 2025). With all extension options exercised, as they were, the senior loan, the EB-5 loan, and EB-5 preferred equity matured May 22, 2025.

**Request for Return of Investment**

61.     The Company reported in 2023, that for the nine months ended September 30, 2023, the Project had total revenues of $36.9 million, and earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $8.2 million. The average daily rate for the nine-month period was $253.93; slightly above 2022 and the occupancy rate was 74.8%; 11.8% above 2022.

62.     Accordingly, the Project was performing well.

63.     Plaintiff requested the return of his investment from the Company in view of the change in his circumstances which was that Plaintiff had withdrawn his I-526 petition.

16

64.     During a follow-up communication in November 2023 with a representative of the Manager, who was aware that Plaintiff had withdrawn his I-526 petition and requested an early exit, and said representative had requested and been furnished proof of the same, it was represented:

> Attached please find the most recent investor update, distributed earlier this month. In order for the Funds to redeem investors, the Project must repay the loans and preferred equity to Pref and Mezz for repayment to the Fund. The maturity date for this investment is May 22, 2024 with a one-year extension option at the borrower's election through May 22, 2025. If all extension options are exercised by the borrower, the senior loan, the EB-5 loan and EB-5 preferred equity will mature on May 22, 2025. May of 2025 is the most likely timeline for return of your investment.

65.     Despite demand and assurances the investment would be returned, Defendants failed and refused to return Plaintiff's investment and related sums as contractually required and/or as equity and law require under the circumstances described herein.

66.     In reliance on Defendants' Offering, and with the intention to apply for a U.S. permanent residence through investment in the Company, Plaintiff invested in the Company but the purpose of the investment has been defeated. Plaintiff, a medical doctor, withdrew his I-526 petition and has secured residence status in an alternative way under the Conrad 30 Program or similar program available to medical doctors.

67.     The controlling agreements provide there may be no return of the investment in the event the I-526 petition is denied, however, when a I-526 petition is

17

withdrawn as under the facts and circumstances here, there is no justification for failing to return an Immigrant Investors investment.

68. Defendants further retained and exercised dominion over Plaintiff's specific, identifiable escrowed funds and, upon release, the Company used those funds in a manner inconsistent with Plaintiff's rights to return of funds under the Offering's conditions and law.

69. Defendants' Offering contained statements regarding illiquidity, restrictions on transfer, and lack of a redemption right; nonetheless, Defendants' conduct and subsequent communications to Plaintiff induced and maintained Plaintiff's investment while omitting and/or misrepresenting material facts concerning the availability and timing of the return of funds upon specified events and conditions precedent.

70. Plaintiff has suffered damages in at least the amount of the $500,000 capital contribution per Unit subscribed and the $50,000 Administrative Fee, together with consequential losses, fees, and costs, in amounts to be proven at trial.

## COUNT I:
## BREACH OF CONTRACT

71. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

72. A valid contract existed between Plaintiff and Defendants, including a Subscription Agreement and related governing documents, the company's Confidential

18

Investment Letter, Private Placement Memorandum, Operating Agreement and related documents governing Plaintiff's subscription, escrow, and refund rights.

73. Under the contract, if Plaintiff's subscription was not accepted, Defendants were obligated to return the money in full without interest.

74. If Plaintiff did not file an I-526 within 180 days and the Manager elected to terminate, the Escrow Agent was to release Plaintiff's Total Capital Contribution and Administrative Fee to Plaintiff without interest.

75. If Plaintiff's I-526 was finally denied after a reasonable opportunity to cure, the Company was obligated to return the Administrative Fee without interest.

76. The controlling documents expressly contemplate that Plaintiff invested with the intention to apply for a U.S. permanent residence through investment in the Company.

77. Defendants breached the contract by failing to return Plaintiff's funds as required under the foregoing provisions and/or by failing to comply with the contractual conditions governing escrow, release, return, and refund under the facts and circumstances applicable to Plaintiff, specifically that he withdrew his I-526 petition.

78. The purpose for which Plaintiff invested in the Company has been defeated and rendered academic or moot.

79. Plaintiff's request is not a redemption option limited by a condition that the loans and preferred equity be repaid.

19

80.     Defendants course of conduct is inconsistent with implied covenant of good faith in contracts.

81.     Plaintiff's request is not limited to the condition that the Project repaid debt before offering redemption options to qualifying investors, who have met the immigration requirements.

82.     As a direct and proximate result, Plaintiff suffered damages, including returnable funds and other losses, in an amount to be proven at trial.

## COUNT II:
## UNJUST ENRICHMENT
### (In the Alternative)

83.     Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

84.     Plaintiff conferred a direct monetary benefit on Defendants by wiring the Total Capital Contribution and Administrative Fee to the Escrow Account for Defendants' controlled Offering.

85.     Plaintiff conferred a direct, measurable benefit upon Defendants in the amount of $500,000 as an EB-5 capital contribution and $50,000 as an Administrative Fee.

86.     Plaintiff's funds were transmitted pursuant to the EB-5 investment structure described in the Private Placement Memorandum and related offering documents.

87.     Plaintiff's capital contribution increased the Company's capitalization, enabled Defendants to represent project financing capacity, Supported loan leverage and

20

project viability, generated management fees and indirect compensation to the Manager.

88. The Administrative Fee directly funded Defendants' operations, marketing, and offering expenses.

89. Defendants accepted and retained the benefit, including the ability to use the funds for the Company's purposes after release and to retain any unexpended portion of the Administrative Fee after covering commissions, legal, marketing, and other costs.

90. Defendants controlled the escrow release process and authorized the transfer of Plaintiff's funds into Company accounts.

91. Defendants were aware that Plaintiff's investment was made solely for the purpose of securing lawful EB-5 immigration status, maintaining funds "at risk" in compliance with USCIS regulations, participating in a specific project structure represented in the offering materials.

92. Defendants retained Plaintiff's capital without conferring immigration benefit or complying with Offering terms.

93. It is inequitable for Defendants to retain Plaintiff's funds because Plaintiff did not receive the bargained-for immigration or financial benefit.

94. Defendants' retention of Plaintiff's capital is unjust because the foundational premise of the transaction, lawful EB-5 compliant deployment of funds, was frustrated.

95. Even if a contract governs certain aspects of the parties' relationship,

21

Defendants' inequitable conduct extends beyond mere breach and includes structural concealment, retention of funds after demand, Plaintiff has not received the essential benefit of the bargain.

96.     Equity will not permit Defendants to profit from Plaintiff's immigration-restricted investment while depriving Plaintiff of both immigration relief and return of capital.

97.     Under the circumstances, Defendants' retention of the benefit is inequitable, particularly where the contract required specified returns of funds and limited the Company's entitlement to retain only certain amounts upon petition denials.

98.     Plaintiff has suffered consequential harm including lost opportunity costs, financial disruption and exposure to additional legal expenses.

99.     Plaintiff is entitled to restitution and/or disgorgement in an amount to be proven at trial.

100.    Equity requires restitution.

## COUNT III:
## CONVERSION

101.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

102.    Plaintiff deposited $500,000 as an EB-5 capital contribution and $50,000 as an Administrative Fee pursuant to the Private Placement Memorandum ("PPM"), Subscription Agreement, and Operating Agreement governing Anaheim Hotel Investment LLC (the "Company").

22

103. Plaintiff's $500,000 capital contribution constituted a specific, segregated, and identifiable fund, traceable to the escrow account, the Company's capital account ledger, the Project financing transaction and /or downstream transfers.

104. The Administrative Fee likewise constituted a fixed, identifiable sum collected for defined offering-related purposes.

105. Plaintiff's funds were not general corporate revenue but were Individually subscribed, accounted for per investor, recorded in capital accounts, subject to specific use restrictions and governed by defined return triggers.

106. Plaintiff had a right to immediate possession of specific, identifiable funds placed into the designated Escrow Account, subject only to the offering's escrow conditions and stated return events.

107. Defendants intentionally exercised dominion and control over those specific funds inconsistent with Plaintiff's rights by directing and obtaining release and by refusing to return the funds upon the occurrence of contractual return events and/or lawful demand.

108. Defendants exercised unauthorized dominion and control over Plaintiff's specific funds by transferring funds to or commingling funds with affiliates not disclosed in the PPM.

109. Defendants exercised unauthorized dominion and control over Plaintiff's specific funds by retaining the capital after demand despite events triggering return

23

obligations.

110.    Plaintiff had an immediate right to possession of his $500,000 capital contribution upon the occurrence of triggering events including that his I-526 petition was withdrawn.

111.    Defendants' continued retention of Plaintiff's funds, after demand and after occurrence of events requiring return, constitutes an intentional and wrongful exercise of dominion and control over Plaintiff's property.

112.    Defendants' conduct was without authorization and in derogation of Plaintiff's rights.

113.    Defendants' conduct constitutes more than breach of contract and represents an intentional assumption of ownership rights over Plaintiff's funds inconsistent with Plaintiff's superior possessory interest.

114.    As a direct and proximate result of Defendants' conversion, Plaintiff has been damaged in an amount no less than $500,000 (capital contribution) and the $50,000 (administrative fee, as applicable).

115.    Defendants' conduct is willful, knowing, and in reckless disregard of Plaintiff's property rights.

116.    As a result, Plaintiff suffered damages in an amount to be proven at trial.

## COUNT IV:
## INTENTIONAL MISREPRESENTATION
## AND FRAUDULENT CONCEALMENT

117.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

118.    Defendants made material misrepresentations and/or omissions in connection with the solicitation of Plaintiff's investment, including communications and offering materials that failed to accurately disclose and/or that misstated the availability, timing, and conditions for return of funds and liquidity, despite the existence of significant restrictions and the lack of a redemption right as is relative to when an Immigrant Investor's petition is withdrawn.

119.    Defendants' offering documents also contained broad risk disclosures, forward-looking statements, and non-reliance statements; however, Defendants were not authorized to provide information contrary to the offering materials, and the delivery of the materials did not imply that the information remained correct after their date—facts that heightened Defendants' duty to avoid misleading updates and omissions during ongoing solicitations and handling of funds.

120.    Defendants knew or should have known of the falsity or misleading nature of the statements and omissions, intended that Plaintiff rely on them, and Plaintiff reasonably relied to Plaintiff's detriment by investing and maintaining funds at risk.

121.    Specifically, Defendants have failed to distinguish the facts and circumstances applicable to Plaintiff, withdrawal of I-526 petition, from a redemption

option to qualifying investors, who have met the immigration requirements.

122. Further, at no point in the PPM is "Anaheim Hotel Investment 1 LLC" ("AHI-1") identified as an issuer, a co-issuer, a downstream entity, a special purpose vehicle, a recipient of investor funds, or a material participant in the capital structure.

123. Instead, AHI-1 first appears in the Comprehensive Combined Business Plan, which was separate from and subsequent to the PPM.

124. The existence and role of AHI-1 materially altered the investment structure by introducing an Potentially subordinating EB-5 investor funds additional entity in the capital stack, potentially altering priority of repayment, changing the risk profile of the transaction and affecting USCIS compliance analysis.

125. Defendants knew, or recklessly disregarded, that the identity of the true issuer or downstream recipient of funds is material to EB-5 investors, that the EB-5 investors rely heavily on offering documents to assess immigration risk, that structural transparency is essential for USCIS compliance.

126. Defendants intentionally omitted AHI-1 from the PPM to conceal structural risk, simplify the offering presentation, avoid scrutiny regarding intercompany relationships, induce investment by minimizing perceived complexity and risk.

127. The omission of AHI-1 from the PPM constitutes a material omission of fact.

128. A reasonable EB-5 investor would consider it important to know the identity of every entity in the capital structure, whether funds from the Offering were

26

being transferred to an undisclosed affiliate, whether repayment depended on an entity not described in the offering memorandum.

129. Defendants had a duty to disclose the existence and role of AHI-1 because they were selling securities, they possessed superior knowledge not available to investors.

130. Plaintiff reasonably relied upon the PPM as the controlling disclosure document.

131. Plaintiff was not aware of the internal structural documents or undisclosed affiliate agreements at the time of investment.

132. Plaintiff invested $500,000 in reliance on the accuracy and completeness of the PPM.

133. The omitted information was necessary to make the PPM not misleading and the offering was directed to foreign investors dependent on accurate disclosure for immigration purposes.

134. Had Plaintiff known that AHI-1 existed, that investor funds would flow through or depend upon AHI-1, that the capital structure materially differed from the PPM description, Plaintiff would not have invested.

135. Defendants acted knowingly, intentionally, or with reckless disregard for the truth.

136. The omission was not accidental but part of the offering design.

27

137. Defendants' conduct was willful, malicious, and in conscious disregard of Plaintiff's rights.

138. Plaintiff suffered damages as a direct and proximate result, in an amount to be proven at trial.

## COUNT V:
## SPECIFIC PERFORMANCE

139. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

140. Defendant Anaheim Hotel Investment LLC (the "Company") offered and sold Units of limited liability company interest pursuant to its Private Placement Memorandum dated April 2018 (the "PPM").

141. Plaintiff invested $500,000 in reliance upon the PPM, Subscription Agreement, and Operating Agreement, and became a Class X Member of the Company.

142. The Operating Agreement and PPM represent that Financing extended by the Company would generally have a term of at least five years.

143. That Class X Members' capital would remain at risk solely for purposes consistent with the EB-5 Program.

144. That net proceeds would not be distributed prior to completion of the two-year conditional residency period or I-829 approval.

145. The Plaintiff's immigration petition was withdrawn.

146. Plaintiff has fully performed all conditions required under the Subscription Agreement and Operating Agreement.

28

147.    Despite due demand, the Company has failed and refused to return Plaintiff's $500,000 capital contribution.

148.    The governing documents create contractual and equitable obligations concerning the handling, purpose, and return of invested capital under defined triggering events including when an Immigration Investors petition is withdrawn.

149.    Plaintiff seeks enforcement of the contractual and equitable obligation requiring the return of invested capital under the specific triggering conditions outlined in the PPM and Operating Agreement including when an Immigration Investors I-526 petition is withdrawn.

150.    The capital contribution constitutes a specifically identifiable fund, originally segregated in escrow, and traceable to the Company's financing structure.

151.    The investment was made exclusively to satisfy federal immigration requirements.

152.    The EB-5 program requires capital to remain "at risk" only for lawful program purposes which no longer apply to Plaintiff since his petition has been withdrawn.

153.    Continued retention of Plaintiff's funds outside program compliance frustrates the core purpose of the contract.

154.    Equity requires that the Company specifically perform its obligation to return Plaintiff's $500,000 capital contribution where his petition has been withdrawn.

155. The immigration objective cannot be achieved consistent with the Offering terms, and Company materially breached the governing documents by refusing to return Plaintiff's investment.

156. Plaintiff has no adequate remedy at law because the funds were contributed for a limited and defined immigration-related purpose and the governing documents limit distributions and redemption rights.

157. Specific performance is appropriate where as here, a valid contract exists, Plaintiff has performed, Defendants have failed to perform, and the subject matter is unique or equitable relief is necessary.

158. All conditions precedent to the Company's obligation to return capital have been satisfied, excused, or waived.

159. Plaintiff is entitled to an order directing Defendant to return the $500,000 capital contribution, together with statutory interest, and such further equitable relief as the Court deems just and proper.

## GOVERNING LAW

160. Wisconsin law governs Plaintiff's claims.

## JURY TRIAL

161. Plaintiff demands a trial by jury on all issues so triable. Plaintiff reserves all rights and positions concerning enforceability of any contrary agreement provision.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

a) On Count I (Breach of Contract): awarding damages for all amounts Defendants were obligated to return, including but not limited to the Total Capital Contribution and/or the Administrative Fee as applicable under the contractual provisions, together with pre- and post-judgment interest;

b) On Count II (Unjust Enrichment): ordering restitution/disgorgement of benefits unjustly retained, including return of the Total Capital Contribution and Administrative Fee;

c) On Count III (Conversion): awarding the value of the converted funds, together with appropriate interest;

d) On Count IV (Intentional Misrepresentation and Fraudulent Concealment): awarding compensatory damages in an amount to be proven at trial, rescission, return of investment, interest and costs;

e) On Count V (Specific Performance) ordering specific

31

performance requiring Defendant Anaheim Hotel Investment LLC to return Plaintiff's $500,000 capital contribution and statutory interest;

f) Awarding Plaintiff costs and such other and further legal or equitable relief as the Court deems just and proper, including specific performance and equitable relief within the scope available under the agreements and designated court;

g) Granting any further relief permitted by Wisconsin law and consistent with the governing agreements and limitations.

Dated: East Meadow, New York
        February 28, 2026

                                        s/ Anthony W. Cummings
                                        _____
                                        Anthony W. Cummings, Esq.
                                        Attorney Bar Number: 2228450
                                        Attorney for Plaintiff
                                        CERTILMAN BALIN
                                        ADLER & HYMAN, LLP
                                        90 Merrick Avenue
                                        East Meadow, New York 11554
                                        Telephone: (516) 296-7000
                                        E-mail: acummings@certilmanbalin.com

32